UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANI PHARMACEUTICALS, INC.,

Plaintiff,

-against-

CABARET BIOTECH LTD.,

Defendant.

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS**

19 Civ. 5409 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

This declaratory judgment action arises out of a dispute over the interpretation of several interrelated contracts——among them, a Tripartite Agreement, an Escrow Agreement, and an Assignment Agreement, discussed *infra*——that govern royalty payments owed in relation to certain patent rights. Plaintiff moves for judgment on the pleadings, *see* Fed. R. Civ. P. 12(c), seeking a judgment declaring, in short, that the Escrow Agreement is unenforceable insofar as it purports to alter Plaintiff's right to payment under the Tripartite and Assignment Agreements. Defendant, in essence, seeks a declaration inverse to that sought by Plaintiff. For the reasons set forth below, Plaintiff's motion is granted.

**Factual Background**

The relevant facts, although complicated, are not in dispute. In 2004, Cell Genesys, Inc. ("Cell Genesys") and The Regents of the University of California ("The Regents"), entered into an Inter-Institutional Agreement ("IIA") regarding the commercialization of certain patent rights relating to a drug designed to treat Non-Hodgkin lymphoma. *See* Comp., ECF No. 22, at ¶¶ 25-29; Ans. ECF No. 12, at ¶¶ 25-29; Counterclaim, ECF No. 12, at ¶¶ 20-29. Under the IIA, Cell Genesys and The Regents agreed that The Regents would be responsible for commercializing the patent rights on behalf of both parties and that The Regents would pay Cell

Genesys half of the "Net Revenues" received from its commercialization of the license. *See* Comp. at ¶ 29; Ans. at ¶ 29; Counterclaim at ¶ 23; IIA, ECF No. 25-1, at §§ 1.3-1.5, 4.1-4.2, 5.1.

In 2012, Cell Genesys's successor, BioSante Pharmaceuticals, Inc. ("BioSante"),[1] The Regents, and Dr. Zelig Eshhar executed a three-way agreement (the "Tripartite Agreement") governing shared rights to (a) the patents underlying the IIA, and (b) similar patent rights held by Dr. Eshhar.[2] *See* Comp. at ¶¶ 33-34; Counterclaim at ¶ 24; Tripartite Agmt., ECF No. 1-1. The parties to the Tripartite Agreement agreed to grant Dr. Eshhar responsibility for commercializing and licensing the patent rights on behalf of all three signatories. *See* Tripartite Agmt. at §§ 3.1-3.7. As to "Financial Terms," the Tripartite Agreement requires Dr. Eshhar to periodically pay to The Regents 25% of "Net Revenues,"[3] of which amount The Regents would retain half and pay half to BioSante:

> 4.1. On or before April 30 of each year, Eshhar shall distribute to The Regents one-quarter (1/4) of Net Revenues accrued during the most recently completed fiscal years (which ends December 31).
>
> 4.2. The Regents shall distribute its share of the Net Revenues to BioSante as per the terms of the IIA[(half of the amount paid to the Regents)]. Each party is solely responsible for calculating and distributing to its respective inventors any share of Net Revenues due in accordance with its respective patent policy.

*Id*. at §§ 4.1-4.2. In the years following, Eshhar's company, Defendant Cabaret Biotech, Ltd. ("Cabaret") succeeded to his rights and obligations under the Tripartite Agreement, and Plaintiff ANI Pharmaceuticals, Inc. ("ANI") succeeded, by merger, to the rights of BioSante. *See* Comp.

---

[1] Cell Genesys merged with BioSante in 2009, at which time BioSante assumed all of Cell Genesys's rights under the IIA. *See* Comp. at ¶ 32; Counterclaim at ¶ 23.

[2] Dr. Eshhar obtained patents covering material similar to that which was covered by the patents held by Cell Genesys and The Regents. *See* Comp. at ¶ 30-33; Ans., ECF No. 12, at ¶¶ 30-33; Counterclaim at ¶¶ 20-22.

[3] "Net revenues" are defined as "proceeds received by Eshhar from milestone payments, royalty and sublicense fees obtained from the licensing of Patent Rights less all reasonable and actual out-of-pocket costs … incurred by [The Regents] or Eshhar in the preparation, filing, prosecution, and licensing of Patent Rights." Tripartite Agmt. at § 1.3.

at ¶¶ 43-44; Ans. at ¶¶ 43-44; Counterclaim at ¶ 33. Thus, Cabaret had the obligation to pay a portion of Net Revenues to The Regents, and The Regents had the obligation to pay half of the amount it received to ANI——all as spelled out in the Tripartite Agreement

In 2013, Cabaret entered into a licensing agreement (the "License Agreement") with Kite Pharma, Inc. ("Kite"), under which Kite agreed to make annual payments to Cabaret, tied to the success of the commercialization of the underlying patents. Under to The Tripartite Agreement, as described above, Cabaret was required to pay a portion of the payments received from Kite to The Regents, and The Regents was then required to pass along half of that payment to ANI. Cabaret, pursuant to other agreements not relevant to the instant dispute, was required to pay portions of the payments it received from Kite to various other stakeholders. *See* Comp. at ¶ 57; Counterclaim at ¶ 37. In 2017, Kite was acquired by Gilead Sciences, Inc. ("Gilead"). The record is unclear as to whether Gilead assumed Kite's obligations under the License Agreement by way of the acquisition. *See* Comp. at ¶¶ 6, 61-63; Counterclaim at ¶¶ 36-38.

Fees and royalties were paid without major incident until October 2018, at which time Gilead informed Cabaret, in substance, that Gilead doubted the enforceability of the patent rights held by Cabaret, and that Kite would therefore make all ensuing payments "under protest." *See* Comp. at ¶ 62; Counterclaim ¶ 38. Cabaret, fearing an attempt by Gilead or Kite to "claw back" payments, sought, in Cabaret's words, to "put in place arrangements that would allow it to pay all stakeholders pursuant to their agreements while confirming that Cabaret could recoup those funds if Gilead succeeded in clawing back payments made under protest." Cabaret Opp. Br., ECF No. 26, at 6. To that end, Cabaret proposed to various stakeholders with an interest in the Kite payments, including ANI and The Regents, that they enter into agreements with Cabaret under which Cabaret would, among other things, withhold Kite's payments until Cabaret could

be sure it was "fully protected" against litigation with Gilead, Counterclaim at ¶¶ 45-47; Comp. at ¶¶ 64-78; Counterclaim at ¶ 47.  ANI did not agree to enter any such agreement, and reminded Cabaret of ANI's right to half of the revenues Cabaret released to The Regents.  *See* Comp. at ¶ 69; Counterclaim at ¶¶ 46-58.  Ultimately, all stakeholders, but for ANI, agreed to some form of the arrangement proposed by Cabaret.  *See* Counterclaim at ¶¶ 59-62.

Thus, in March 2019, The Regents and Cabaret entered into a Common Interest and Escrow Agreement (the "Escrow Agreement"), which provided that Cabaret would place the payments owed to The Regents under the Tripartite Agreement into an escrow account until Gilead/Kite withdrew its protest to making payments under the License Agreement.  *See* Comp. at ¶¶ 86-88; Counterclaim at ¶ 64; Escrow Agmt., ECF No. 1-5, at § 6.  The Escrow Agreement provides in relevant part that Cabaret

> shall establish a new account … with a recognized financial or escrow institution and, with respect to each Payment Under Protest received by Cabaret, deposit into such account an amount *equal to the distribution that [The Regents] is entitled to receive from such Payment Under Protest* pursuant to the [Tripartite Agreement], all such amounts to be held in escrow for the benefit of [The Regents] …

Escrow Agmt. at § 6 (emphasis added)

After becoming aware of The Escrow Agreement, ANI complained to The Regents, expressing concern that the Escrow Agreement curtailed ANI's right to payment under the Tripartite Agreement.  In response, The Regents advised ANI that ANI's revenue share was not affected by the Escrow Agreement:

> The agreement you forwarded *only pertains to [the Regent's] share of revenues* and was only signed b/c we were executing the assignment with ANI in parallel. *I'm not sure what bearing it could have on ANI since it is personal to [The Regents]*, so if you have any questions please discuss it with [Cabaret's counsel].

Email Exchange, ECF No. 1-6 (emphases added).

The "assignment" to which The Regents referred above was executed April 3, 2019, by and between The Regents and ANI, a week after The Regents and Cabaret had entered the Escrow Agreement. That agreement, entitled an Assignment and Assumption Agreement (the "Assignment Agreement"), assigned from The Regents to ANI the right to receive, directly from Cabaret, ANI's one-half share of the payments due from Cabaret to The Regents under the Tripartite Agreement. *See* Comp. at ¶¶ 80-81; Counterclaim at ¶¶ 73-76; Assignment Agmt., ECF No. 1-4, at §§ 1-2. The Tripartite agreement is silent as to assignability.

Cabaret has since maintained that the Assignment Agreement is invalid because it requires Cabaret to make payments directly to ANI, rather than to The Regents. *See* Comp. at ¶ 103; Counterclaim at ¶¶ 72-78.

**Procedural History**

ANI commenced this action on June 10, 2019, seeking a declaratory judgment to determine the parties' rights and obligations under the Tripartite Agreement, Escrow Agreement and Assignment Agreement. Specifically, ANI seeks a declaration that ANI is entitled to receive its share of payments under the Tripartite Agreement directly from Cabaret, and that the Escrow Agreement cannot defeat this entitlement. Cabaret's counterclaims seek the inverse of the relief sought by ANI. That is, Cabaret seeks a declaration that the Assignment Agreement is not valid because it modifies the terms of the Tripartite Agreement, and that the Escrow Agreement is enforceable because it is fully consistent with the Tripartite Agreement.

On November 1, 2019, ANI moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF No. 23. The parties' subsequent efforts to settle were unsuccessful, and the motion is now ripe for decision.

## Discussion

"After the pleadings are closed——but early enough not to delay trial——a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Motions under Rule 12(c) are reviewed under "the same standard as that applicable to a motion under Rule 12(b)(6)," *Haden v. Paterson*, 594 F.3d 150, 157 n.4 (2d Cir. 2010), and thus a motion for judgment on the pleadings under Rule 12(c) is only proper when, "with all reasonable inferences drawn in favor of the non-moving party, the non-moving party has failed to allege facts that would give rise to a plausible claim or defense," *CIT Bank, N.A. v. Neris*, 385 F.Supp.3d 241, 244 (S.D.N.Y. 2019) (quotation marks omitted). On a 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quotation marks omitted).

Under California law, the terms of a contract cannot be altered except with the consent of *all* contracting parties.[4] *See, e.g., Riverside Rancho Corp. v. Cowan*, 88 Cal. App. 2d 197, 208 (Cal. App. 2nd Dist. 1948) ("A modification of a contract can be made only with the consent of all parties to it."). This straightforward principle begins and ends the present dispute.

The Tripartite Agreement——which binds ANI, Cabaret, and The Regents——requires that Cabaret make payments to The Regents and that The Regents pay half its receipts to ANI. *See* Tripartite Agmt. at §§ 4.1-4.2. The Escrow Agreement could not diminish ANI's right

---

[4] The Tripartite Agreement and Assignment Agreement are governed by California law, *see* Tripartite Agmt. at § 7; Assignment Agmt. at § 8, whereas the Escrow Agreement is governed by New York law, *see* Escrow Agmt. at § 8. On this, the parties agree. *See* ANI Br., ECF No. 24, at 10 n.8; Cabaret Opp. Br. at 9. Since the parties do not make distinction between California and New York laws, I need not determine any conflicts of law.

to receive its share from The Regents, because ANI was not a party to that agreement.[5] Neither Cabaret nor The Regents had the authority to limit ANI's rights under the Tripartite Agreement, whether via the Escrow Agreement or otherwise.

Cabaret, for its part, contends that the Escrow Agreement does not "impair ANI's rights because Cabaret remains able to fulfill its obligations to The Regents, and The Regents' obligations to ANI … remain unchanged." Cabaret Opp. Br. at 12. This might be so if ANI had not been a party, with Cabaret and The Regents, to the Tripartite Agreement. But ANI *was* a party, and Cabaret was obligated by the terms of the agreement to pay Net Revenues to The Regents, knowing that The Regents was receiving these revenues both for itself and for ANI. Cabaret's contention is contrary to a basic rule of contract interpretation, that the whole must be interpreted, and not a single constituent clause in isolation. *See, e.g.*, *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027 (Cal. App. 4 Dist. 2011) ("[T]he meaning of a contract must be derived from reading the whole of the contract."); *cf.* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). And while two parties to a three-way contract can often modify that contract, they cannot do so when the modification harms the third party. *See, e.g.*, *Hotle v. Miller*, 334 P.2d 849, 852 (Cal. 1959). The Escrow Agreement could, perhaps, modify Cabaret's duty to pay to The Regents the portion of Net Revenues payable for the benefit of The Regents; the Escrow Agreement could not modify the portion of Net Revues payable to The Regents for the benefit of ANI.

I next conclude that the Assignment Agreement is enforceable and entitles ANI to direct payment from Cabaret. The Assignment Agreement assigns from The Regents to ANI the

right to be paid directly by Cabaret under the Tripartite Agreement. The Tripartite Agreement is silent as to assignability, but California law, which Cabaret and ANI agree governs that contract, *see* ANI Br. at 15-16; Cabaret Opp. Br. at 17, provides for the general assignability of contract rights, except where the assignment materially prejudices the non-assigning party:

> Under California law, while rights are generally assignable, they cannot be assigned if they would materially prejudice the non-assigning party. *See, e.g.*, *Farmland Irrigation Co., Inc. v. Dopplmaier*, 308 P.2d 732, 741 (Cal. 1957) ("Rights likewise cannot be assigned if the assignment would materially impair the nonassigning party's chance of obtaining the performance he expected.").

Cabaret Opp. at 17. Cabaret insists the "Assignment Agreement prejudices Cabaret by depriving Cabaret of its bargained-for right under the Tripartite Agreement to deal only with The Regents *and of the protections that The Regents … had granted Cabaret, including the protections under the Escrow Agreement*." *Id*. (emphasis added).

Cabaret's position is unpersuasive. Cabaret contends that the Assignment Agreement curtails protections it gained under the Escrow Agreement, but as we have already reviewed, the Escrow Agreement could not modify ANI's preexisting rights under the Tripartite Agreement. Nor, in the absence of a non-assignability clause, can Cabaret stop an assignment from The Regents to ANI. The assent of an obligor is typically not needed for an effective assignment by the obligee, especially when the duty is one merely to pay money. *See, e.g.*, Rest. (Second) of Contracts § 323, cmt. (a) ("The assent of the obligor is not ordinarily necessary to make an assignment effective."); *id*. at § 317 ("A contractual right can be assigned unless … the substitution of a right of the assignee for the right of the assignor would materially *change the duty of the obligor*, or materially increase the burden or risk imposed on him *by his contract*"); *id*. at § 317, cmt. (d) ("When the obligor's duty is to pay money, a change in the person to whom the payment is to be made is not ordinarily material."); *see also* Cal. Civ. Code § 1458 ("A right

arising out of an obligation is the property of the person to whom it is due, and may be transferred as such.”). Here, Cabaret’s duty, pre- and post-assignment is to pay money. And while Cabaret bemoans that “every party with an interest in the Gilead payments has agreed [to] protections, such as an indemnity or escrow,” Cabaret Opp. Br. at 17, Cabaret fails to identify where *in the Tripartite Agreement* such protection exists. Contract rights are not subject to a popularity test. Nor is it relevant that ANI allegedly sought unrelated concessions from Cabaret as a precondition to entering any protective agreement.[6] Whether ANI’s behavior was overly aggressive or discourteous is not for the Court to say. What is for the Court to say is that Cabaret points to no legal authority that entitles an obligor to void the obligee’s assignment of rights simply because the obligor finds the new assignee to be annoying.

**Conclusion**

For the foregoing reasons, Plaintiff’s motion for judgment on the pleadings is granted. The Clerk shall close the open motion (ECF No. 23) and enter judgment for Plaintiff, with costs. Thus, the case is closed.

SO ORDERED.

Dated: April 26, 2020
New York, New York

/s/
ALVIN K. HELLERSTEIN
United States District Judge

[6] *See, e.g.*, Cabaret Opp. Br. at 7 (“[E]very other stakeholder … agreed that [new protections] w[ere] appropriate”); *id.* (ANI, however, tried to use Cabaret’s predicament to raise unrelated demands.”).